**PAUL E. HAWKINSON CO. et al. v. SKOGMO–GAMBLE, Inc., et al.**

No. 2845.

District Court, D. Minnesota, Fourth Division.

Aug. 22, 1937.

Ralph Merchant, Frank D. Merchant, and Merchant & Kilgore, all of Minneapolis, Minn., for plaintiffs.

George S. Stebbins, W. S. McDowell, Albert Grobstein, of Washington, D. C., and C. A. Taney and Fowler, Youngquist, Furber, Taney & Johnson, all of Minneapolis, Minn., for defendants.

BELL, District Judge.

This is an action in equity by Paul E. Hawkinson Company and its licensee, Hawkinson Tire Tread Service, Inc., both Minnesota corporations, against Skogmo-Gamble, Inc., and Gamble Stores, Incorporated, both Delaware corporations, engaged in business in the State of Minnesota, for infringement of letters patent No. 1,917,261, dated May 14, 1931, entitled "Method of Retreading Tire Casings," and No. 1,917,262, dated December 20, 1932, entitled "Apparatus for Retreading Tire Casings." The defendants deny the validity of the patents and infringement.

Many patents on methods and apparatus for retreading pneumatic tires have been issued. Motor vehicle tires receive the greatest wear on the road-engaging surface, which is the tread or outer periphery of the tire casing. Tires become unusable and worthless because the rubber is worn from the tread even though the cords, side walls, and rim-receiving flanges may be sound and capable of giving much more service. During the life of the automotive industry, an effort has been made to discover and perfect an efficient method of retreading worn tires. The application of new rubber to the worn tread naturally has formed the bases for the various processes used. The art of vulcanizing rubber on the tread of tires has been found comparatively simple, but the process of retreading tires successfully has proved difficult.

The evidence in this case, especially the prior art letters, shows that a well-recognized problem has been encountered. This problem has been to discover some method and apparatus for use in vulcanizing new rubber on the worn tread of tires without damaging the casing, particularly the side walls, by excessive heat. The application of heat is necessary to vulcanize rubber, but excessive heat is injurious and destructive to rubber. This problem was recognized even by the pioneers in the field and efforts were made by them to solve it. Under the processes generally followed, the old rubber was removed from the tread, new rubber was applied, the casing with the new rubber thereon placed in a metal mold, and sufficient heat applied to vulcanize the new rubber. During the process of vulcanization, when the new rubber is in a liquid or semi-liquid state, it must be confined to the tread by apparatus designed for that purpose. In the early development of the art, the mold was made to cover the casing entirely or to come well down on the sides thereof and to contact the side walls so as to envelop the new material; and, as a result, when heat sufficient to vulcanize was applied, the old rubber on the side walls was deteriorated by overheating, and when placed in use and subjected to weight and pressure, the damaged portions readily gave way. Later an effort was made in devising molds by those engaged in the research to leave the side walls in part exposed so as to reduce the danger of overheating. The molds that had been used prior to 1931, however, were sufficiently arcuate cross-sectionally to contact, not only the tread of the tire but also the side walls along the margin of the mold, and they, therefore, contained the defect mentioned. Various cooling methods were introduced into the equipment. In the many efforts to avoid overheating an insulation of asbestos was used, metals of different heat conductivity were introduced, and cooling fluids were circulated through canals in close proximity to the casing.

Paul E. Hawkinson, who was engaged in the business of repairing and retreading tires, obviously realizing the absolute necessity of keeping the metal mold from contact with the side walls of the casing in the retreading process, undertook to solve the problem. He recognized that the only way to retread a rubber tire was to vulcanize new rubber on the tread, that a metal mold was essential, and that the application of heat was unavoidable. He observed that the greatest wear was along the apex of the crown or the center of the tread of the tire, that the wear was less along the margins thereof, and that as a result there remained along the edges of the tread a comparatively substantial thickness of the original rubber which formed "shoulders" as designated in the trial of this case. He discovered that the shoulders could be utilized as an insulation to protect the metallic mold from contacting the side walls of the casing and to serve as a part of an inclosure to confine the new rubber

during the process of vulcanization. So he proposed the use of an annular mold or matrix substantially flat cross-sectionally with inwardly projecting flanges at the edges that would contact the shoulders—not the side walls—and thus inclose the new material. He further proposed leaving the rubber shoulders intact on the worn casings instead of removing them as others in the art had done. By use of his device, coupled with the step of leaving the old rubber intact at the shoulders, danger of excessive heat to the side walls was effectually removed.

Hawkinson made application and received patents on his method and apparatus, and it is contended by the plaintiffs that these patents have been infringed by the defendants. It is alleged that claims 4, 5, 6, 9, and 10 of the apparatus patent are infringed. Claim 4 is typical; it reads: "A tire treading device consisting of an integral cylinder-like mold having continuous tread material confining flanges inwardly projecting from the marginal portions of said mold, said flanges being of such construction and extent as to make only line contact with laterally spaced shoulder portions of a tire and support the mold over the crown portion and out of contact with side wall portions of the tire, and heating means extending circumferentially of the mold."

It is alleged that claim 6 of the method patent is infringed. It reads: "The method of treading tire casings, which comprises applying a tread material to the crown of the casing intermediate the shoulders thereof, in placing the casing within and permitting expansion of the same against an annular matrix that engages only the newly applied crown tread and adjacent shoulders of the casing, whereby to confine the newly applied tread material between the shoulders when under pressure and in a flowing condition, in applying internal expanding pressure to the casing to expand the same against the matrix, and applying heat to the matrix."

The plaintiffs' apparatus consists of an annular mold, designated a "matrix," made of sheet metal of slightly less circumference than the casing to be retreaded, substantially flat cross-sectionally, having flanges projecting inwardly from the edges thereof, with design-forming extensions or ribs equidistant from each other and from the flanges on the interior surface of the matrix, and a small metallic tube, through which steam can be circulated, coiled circumferentially about the outer surface thereof, attached and distributed so as to form a suitable heating device. The plaintiffs also provide a device for spreading the side walls of the casing and another, a pair of ring-like members, to clamp against the side walls of the casing after it is inserted within the matrix to prevent lateral expansion.

A tire retreaded by plaintiffs' process shows that the flanges, when heat and pressure are applied, are forced into the shoulders; and that when the flanges under pressure enter the shoulders the new rubber is confined between the tread and the matrix and can be vulcanized without damage to any portion. In the process, the new rubber, when heated to a liquid state, flows from the edges of the crown toward the center thereof to equalize pressure and as a result becomes thickest at the center of the crown where it is most needed. When the casing is removed from the matrix and permitted to resume its normal shape, the newly applied crown tread, which was vulcanized flat cross-sectionally, will stretch into the usual arcuate shape of tire treads. It is stated in the patents that the tendency of the tread to return to its flattened shape renders the casing more easily flexed as it rolls over the road and thereby reduces road resistance; however, this is not in issue.

The defendants contend that the plaintiffs' patents are invalid because of anticipation. Eleven patents were introduced in evidence to show the prior art. Attention was directed particularly to patents issued to Mundale, Burdette, Ruark, Howell, and Jones. Mundale teaches the application of new rubber to the tread of a casing, clamping a mold thereon, adding pressure by inserting and inflating an inner tube therein, exposure of a portion of the side walls for cooling purposes, and the application of heat. Burdette teaches the use of a mold of slightly less circumference than the periphery of the casing, the use of pressure to force the casing against the mold, exposing portions of the side walls to reduce overheating the casing. Ruark teaches the use of a mold, the use of air pressure to bring the tread in contact therewith, and an effort to confine the heat to the tread to reduce injury to the casing. Howell teaches the use of an integral mold, reducing the circumference of the casing so

as to insert it within the mold and allowing it to expand to increase the pressure of the tread against the mold. The chief objective of Jones as shown by his application for a patent in 1921 was to avoid heat damage by using material in the construction of the mold of different heat conductivity and the circulation of a cooling fluid through the device. In 1928 Jones made another effort to reduce excessive heat by a device constructed along similar lines. No actual use of any of the molds of these prior patents was shown at the trial.

Some features of plaintiffs' patents clearly are revealed in the prior art. Others had used a metal mold, the application of air pressure to force the tread against the mold, the application of heat, exposure of portions of the side wall to reduce overheating, and various cooling methods. The damaging effect of overheating the casing certainly was well recognized and numerous efforts were made to avoid it. However, a careful examination of the apparatus and methods of the prior art shows that the mold cavities were so deep or arcuate cross-sectionally as to extend over the tread of the casing and to contact the side walls sufficiently to cause overheating. No use was made of shoulders in the prior art; indeed, some of the patents directed the stripping of the casing to the "carcass." The prior art clearly does not teach the use of a matrix, with inwardly projecting flanges that engage only the newly applied tread material and adjacent shoulders of the casing so as to confine the new material between the shoulders when under pressure and in a flowing condition. This is the essence of plaintiffs' patents and it cannot be found in any one or all of the prior art patents. In fact, the history of the prior art emphasizes the contribution of Hawkinson.

The figures below show cross-sections of tire and apparatus of the three prior art patents on which defendants chiefly rely. "X" shows the point of contact of the mold with the side walls of the casing in each figure.

BURDETTE PAT. 1-746-763.  RUARK PAT. 1-608-816.

MUNDALE PAT. 1-379-203.

548

The figures below show a cross-section, respectively, of the plaintiffs' and defendants' structures. "A" designates the metallic mold of each, "B" the old rubber, "C" the new rubber, and "D" the line of contact of the confining flanges with the shoulders.

Plaintiff's Structure

It should be observed that the cross-section of the plaintiffs' structure shows a flat matrix; it shows inwardly projecting flanges that make a line contact with the shoulders and that enter the shoulders when heat and pressure are applied, so that the new rubber is completely inclosed, and there is no contact of the flanges or any part of the matrix with the side walls. This was not merely a change in form, degree, size, or proportion, resulting from mechanical skill; it was not merely a new combination of old elements; it was not just a new function obtained by slight changes in an old device; to the contrary, it was a new conception of the means to cure a long-standing and well-recognized defect in the process of retreading pneumatic tires.

■ However, under the evidence in this case some familiar principles in patent law should be noted. A patent for a very meritorious improvement in an old art is entitled to liberal construction. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Reinharts, Inc. v. Caterpillar Tractor Co. (C.C.A.) 85 F.(2d) 628; Fairbanks Morse & Co. v. Stickney (C.C.A.) 123 F. 79. The claims of a patent should be construed to cover the real invention found in them and in the specifications and drawings, and this is especially true where the

invention is meritorious. Barrel Fitting & Seal Corp. v. American Flange & Mfg. Co. (C.C.A.) 74 F.(2d) 569; Greenwood v. Monarch Mfg. Co. (D.C.) 30 F.(2d) 547, affirmed (C.C.A.) 30 F.(2d) 548.

■ Even though commercial success is not a safe criterion of patentable novelty [Tropic-Aire, Inc. v. Sears, Roebuck & Co. (C.C.A.) 44 F.(2d) 580], the inventor of a novel method, which solves a major problem in the art and is attended by practical and commercial success, is entitled to a liberal construction of his claims to secure to him the benefit of his invention. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721.

■ It is true that improvements made by the use of mechanical skill, such as would be received by one skilled in the art, and not by an exercise of the creative faculties, are not invention. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997. But, there may be invention in a new combination of old elements, which produces better results. Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U.S. 426, 38 S.Ct. 547, 62 L.Ed. 7196. The test sometimes applied is whether the combination of old elements has produced a novel and useful result, or an old result in a more advantageous way. Radio Corp. of America v. Dubilier Condenser Corp. (C.A.) 59 F.(2d) 309. The means may appear simple after the result has been achieved. Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177. In that case the court said:

"It is further argued, however, that, supposing the devices to be sufficiently

describe, they do not show any invention; and that the combination set forth in the fifth claim is a mere aggregation of old devices, already well known; and therefore it is not patentable. This argument would be sound if the combination claimed by Webster was an obvious one for attaining the advantages proposed,—one which would occur to any mechanic skilled in the art. But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. It may have been under their very eyes, they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value, and to bring it into notice. Who was the first to see it, to understand its value, to give it shape and form, to bring it into notice and urge its adoption, is a question to which we shall shortly give our attention. At this point we are constrained to say that we cannot yield our assent to the argument, that the combination of the different parts or elements for attaining the object in view was so obvious as to merit no title to invention. Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention. It was certainly a new and useful result to make a loom produce fifty yards a day when it never before had produced more than forty; and we think that the combination of elements by which this was effected, even if those elements were separately known before was invention sufficient to form the basis of a patent."

■ It is contended that there is no novelty in leaving the shoulder portions undisturbed in the preparation of the tire for retreading. This is not claimed as a novelty. However, it is obvious that without shoulders the apparatus and method of plaintiffs would not be a success and this statement applies with equal force to the accused apparatus and method.

It is true that when Hawkinson discovered the use of shoulders he was dealing with a different sort of pneumatic tire from those involved in the prior art. The modern tire has more flexible walls, a larger diameter cross-sectionally, a flatter tread; and, when worn, leaves well-defined shoulders along the margin of the tread. Older tires were of less diameter cross-sectionally, with a more rounded crown, more inflexible walls, constructed for higher pressure; and, when worn, left little or no shoulders on the tread. This in no way detracts from the conception of Hawkinson; to the contrary, it adds vigor to his claim of originality. He faced a new condition, and he conceived a method and devised apparatus for dealing with it. The idea forming the essence of his patents had not entered the minds of those who had developed the prior art.

■ It is further contended that there is no limitation in the claims with reference to "removing less rubber from the shoulders," or leaving the shoulders on the tread. There is not an explicit direction that no rubber shall be removed, or that the shoulders shall remain intact; but claim 4 recites, "said flanges being of such construction and extent as to make only line contact with laterally spaced shoulder portions." The other claims involved contain substantially the same language. Moreover, the specifications and drawings clearly show what is meant by the "shoulders" and that they are to be left on the casing and utilized in the retreading process. Furthermore, the patentee was dealing with the modern worn tire on which he found shoulders and he directed how they should be utilized, rather than to indulge in the superfluity of explicitly stating that they were not to be removed, or of negativing what had been done in the prior art.

■ The point is made that "apparatus limitations in claim 6 do not make old method patentable." It is contended that the recital "whereby the newly applied tread material is confined between a matrix that engages the adjacent shoulders of the casing" is an apparatus limitation. The mere function of a machine is not patentable. Smith Engineering Works v. Nordberg Mfg. Co. (C.C.A.) 68 F.(2d) 492. If the claim contained nothing more than a description of the function of the apparatus, it would be invalid. However, in describing a process, reference may be made to the functions of the apparatus used in performing it. A process usually requires machinery and equipment, but its patentability does not depend on the characteristics of whatever is required in that respect. Gulf Smokeless Coal Co. v. Sutton, Steele & Steele (C.C.A.) 35 F.(2d) 433.

In addition to solving the problem of heat damage in the process of retreading tires, Hawkinson taught the art how to save the old rubber, the labor of removing it, the use of less new rubber, preservation of the original design and appearance, and the use of light, simple, inexpensive equipment. He discovered the process and devised the necessary apparatus to perform it. He made a substantial and meritorious contribution to the prior art, which has proved to be a practical and commercial success and plaintiffs' patents are valid.

The question of infringement remains, and it is necessary to examine the apparatus and method of defendants in the light of the claims of plaintiffs' patents involved herein. The accused apparatus consists of a steel matrix with an opening, as shown in the figure below:

device is used to prevent lateral spreading of the casing when air pressure is applied.

Defendants point to certain differences in the claims of the patent in suit and the accused apparatus. It is contended that: The one specifies an integral, cylinder-like matrix, when the other is neither integral or cylinder-like; the one specifies a matrix made of relatively light, flexible material, when the other is machined from steel; the one specifies a matrix flat cross-sectionally, when the other is arcuate; and the one provides for the application of heat circumferentially of the matrix, when the other does not.

The apparatus really involved in this controversy is the matrix. It is the device that is used to inclose the new rubber and to which heat is applied for vulcanization.

The opening in the matrix shown above may be closed by drawing the ends together with a clamp and by fastening them with bolts. An additional part may be inserted in the opening and the circumference of the matrix thus varied, in proportion to the length of the part inserted, so that it may be made to fit tires of different sizes. When the ends are bolted together the matrix is annular; it is slightly arcuate cross-sectionally, and the edges project inwardly, forming flanges. Design-forming portions likewise project from the inner surface of the matrix. A

The primary feature described by the claims consists of an integral, cylinder-like mold, having inwardly projecting flanges from the marginal portions thereof, said flanges being so constructed as to make only line contact with laterally spaced shoulders and to support the mold over the crown portion and out of contact with the side walls, and a heating means extending circumferentially of the mold. Whether the matrix is made of sheet metal or steel, whether it is substantially flat or slightly arcuate cross-sectionally, whether the heat applied is steam or elec-

tricity, and whether it is integral or cylinder-like when dismantled, are secondary features that are not decisive of the issues in this case. If the accused matrix accomplishes substantially the same result by substantially the same means and in substantially the same way as the matrix described in the claims, it is an equivalent. Sanitary Refrigerator Co. v. Winters et al., 280 U.S. 30, 50 S.Ct. 9, 12, 74 L.Ed. 147; West Disinfecting Co. v. United States Paper Mills, Inc., et al. (D.C.) 44 F.(2d) 790. Devices may appear strikingly different and yet in patent law be equivalents. Patents on important and meritorious improvements, though not basic or primary, are entitled to a fair range of equivalents. Reinharts, Inc. v. Caterpillar Tractor Co., supra; Stebler v. Riverside Heights Orange Growers' Association (C. C.A.) 205 F. 735. Infringement cannot be escaped by merely joining two parts into one integral part, and vice versa, if the same results are accomplished in substantially the same way. Bundy Mfg. Co. v. Detroit Time-Register Co. (C.C.A.) 94 F. 524; Standard Caster & Wheel Co. v. Caster Socket Co. (C.C.A.) 113 F. 162. Making the accused matrix in two parts instead of one, or by making it slightly arcuate instead of flat cross-sectionally, or by applying electricity instead of steam, or by using a different method in getting the casing into or out of the matrix, will not avoid infringement. These changes do not materially affect the function of the apparatus, the method, or the results sought. The Supreme Court characterized such changes in Sanitary Refrigerator Co. v. Winters, supra, wherein it said:

"There is a substantial identity, constituting infringement, where a device is a copy of the thing described by the patentee, 'either without variation, or with such variations as are consistent with its being in substance the same thing.' Burr v. Duryee, 1 Wall. 531, 573, 17 L.Ed. 650. Except where form is of the essence of the invention, it has little weight in the decision of such an issue; and, generally speaking, one device is an infringement of another 'if it performs substantially the same function in substantially the same way to obtain the same result. * * * Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the

same, even though they differ in name, form, or shape.' Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. And see Elizabeth v. Pavement Co., 97 U.S. 126, 137, 24 L.Ed. 1000. That mere colorable departures from the patented device do not avoid infringement, see McCormick v. Talcott, 20 How. 402, 405, 15 L.Ed. 930. A close copy which seeks to use the substance of the invention, and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement. Ives v. Hamilton, 92 U.S. 426, 430, 23 L.Ed. 494. And even where, in view of the state of the art, the invention must be restricted to the form shown and described by the patentee and cannot be extended to embrace a new form which is a substantial departure therefrom, it is nevertheless infringed by a device in which there is no substantial departure from the description in the patent, but a mere colorable departure therefrom."

The conclusion that the claims of the patent read on the accused apparatus seems inevitable. It has edges or flanges inwardly projecting from the marginal portions, said flanges being of such construction as to make only line contact with the shoulders and to support the matrix over the crown portion and out of contact with the side walls of the casing, and it has a circumferential heating means. The outstanding feature of the accused apparatus is identical with that of the patent, in that the inwardly projecting flanges at the marginal portions are adapted to make only line contact with the shoulders and do not contact the side walls. The arrangement of the accused device for avoiding overheating is identical with that of the patent. When the matrix is assembled and in position for use, as it must be considered, it is integral and cylinder-like; it is made of steel instead of sheet metal, but both are metal and serve the same purpose; it is slightly arcuate instead of substantially flat cross-sectionally; but these differences, functionally, are not material. The heating means of the accused apparatus is electricity instead of steam, but the claims of the patent here involved do not specify the kind of heat to be used. The claims in suit provide for a "heating means extending circumferentially of the mold," and that is exactly what the accused apparatus does. The term "substantially flat" cross-sectionally, as specified in the

patents, does not require a "perfectly flat" matrix; "relatively flat" meets the requirement. In so far as the functional use of the accused matrix is concerned, it is "relatively flat"; and it serves the same purpose as a "substantially flat" matrix. Undoubtedly, the accused matrix performs the same function and produces the same result as the one described by the patent.

The novel feature of plaintiffs' method patent as defined in claim 6 is "in placing the casing within and permitting expansion of the same against an annular matrix that engages only the newly applied crown tread and adjacent shoulders of the casing, whereby to confine the newly applied tread material between the shoulders when under pressure and in a flowing condition." In other words, it is the process of forcing the casing against an annular matrix that engages only the new rubber and the shoulders in such a manner as to confine the new rubber between the shoulders. By this process the rubber can be vulcanized on the worn tread where it is desired and no part of the casing injured in the process. It is this feature that differentiates claim 6 of the patent from the prior art. It is this feature that the defendants have copied.

In addition to the novel feature mentioned, the patent, in its specifications and claims, not here in suit, designates others, such as: Buffing the surface of the tread (without removing the shoulders), application of new rubber to the worn tread, lateral spreading of the side walls thus reducing the circumference so that the casing easily may be placed within the matrix, releasing the side walls after the casing is inserted so that it may resume its normal shape and press the tread against the matrix, application of air pressure within the casing so as to increase the pressure of the tread against the matrix, application of sufficient heat circumferentially of the matrix to vulcanize the new rubber, allowing the casing to cool under pressure in the matrix, releasing the air pressure, and spreading the side walls so as to easily remove the casing from the matrix. These steps are secondary to the novel feature above stated and are covered by the more detailed claims. What is desired in the process in its broadest phase as defined by claim 6 is the pressure of the tread against a matrix of the construction described. The method of inserting the casing into the matrix and of taking it out is not involved. The accused method presses the casing against an annular matrix that engages only the new rubber and the shoulders in such a manner as to confine the new rubber between the shoulders. It presses the casing against the matrix by substantially the same means as found in plaintiffs' patent; that is, the casing is placed within the matrix, is drawn against the matrix opposite the opening, as shown in the figure above, which spreads the side walls; the matrix is then closed and drawn against the tread and the ends bolted. The clamp is released and the casing resumes its normal shape, thus pressing the tread against the matrix substantially as in the patents in suit. The inner tube within the casing is then inflated to increase the pressure on the tread against the matrix, again as in the patent. Heat is applied by the circulation of an electric current through the matrix, but it is applied circumferentially, as prescribed by plaintiffs' patent.

Defendants point out certain differences in claim 6 of the method patent and the accused method, as follows: The one provides for spreading the side walls so as to reduce the circumference in order to let the casing into the matrix, while under the other it is wholly unnecessary to spread the side walls; the one provides for releasing the side walls after the casing is inserted within the matrix, so that the tread will expand against the matrix, when, under the other, the circumference of the matrix is reduced by drawing and bolting the ends thereof together, and it is thus drawn in contact with the tread of the casing; and the one provides for spreading the side walls so as to release the casing from the matrix after vulcanization, when, under the other, the matrix is released from the casing by unbolting the ends.

The difference in the process of the patent and that of the accused method, largely, is in getting the casing into the matrix and getting it out, which, of course, is due to the difference in the matrices. One is integral, with a circumference slightly less than that of the casing, and it is necessary to reduce the circumference of the casing by spreading the side walls so as to insert it within the matrix; while the other is open and the casing can be inserted without spreading the side walls. Substantially the same is true in removing the casing, except the process is reversed. The novelty of claim 6 here sued upon, however, lies, not in the method of insert-

ing the casing into or removing it from the matrix, neither is it in the method of applying heat, but it is in the method of pressing a casing against a matrix, such as the one described, and in the manner described, so that the new rubber can be vulcanized without injury to the casing by excessive heat. The limitation of circumferential contraction preparatory to putting the casing into the matrix cannot be read into claim 6; especially is this true where other claims of the patent include this step. Campbell Printing-Press & Mfg. v. Marden (C.C.) 64 F. 782; Automatic Recording Safe Co. v. Burns Co. (C.C.A.) 231 F. 985. Such an interpretation would be necessary only if the prior art were so close that this limitation must be read into the claim to give it validity. Turrill v. Railroad Company, 1 Wall. 491, 17 L.Ed. 668; Temco Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298; McEwan Bros. Co. v. McEwan (C.C.) 91 F. 787. The prior art in the case at bar does not suggest the Hawkinson invention either in its broad or in its detail sense. Furthermore, the introduction to the specification of the Hawkinson method patent specifically lays a basis for two types of claims, one to "a method of applying new tread to the road-engaging crown portions of tire casings," and another to "a method whereby tire casings * * * can be entered into a * * * matrix." The defendants have adopted substantially the same method and perform it in substantially the same way with identically the same results. The differences are colorable only.

The inevitable conclusion is that the claims involved are valid and infringed.