## UNITED STATES RUBBER CO. v. SID-NEY BLUMENTHAL & CO., Inc.

### No. 333.

Circuit Court of Appeals, Second Circuit.

Aug. 4, 1938.

Gifford, Scull & Burgess, of New York City (Newton A. Burgess and Henry M. Leigh, both of New York City, of counsel), for appellant.

Daggett & Hooker, of New Haven, Conn. (E. Clarkson Seward and W. Saxton Seward, both of New York City, and David L. Daggett, of New Haven, Conn., of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The three patents in suit relate (1) Gibbons to the process of manufacturing vulcanized rubber compositions, (2) Hopkinson to the coating of various fibrous materials with latex compositions, and (3) Foster & Cook to the application to needled pile fabric of latex compositions such as those described by Gibbons and Hopkinson.

### Gibbons Patent No. 1,654,167.

The patent to Gibbons is particularly for a process of vulcanization where the vulcanizing ingredient or agent is combined with Latex. Gibbons' only claim reads as follows: "Process of manufacturing vulcanized rubber compositions which comprises the drying and vulcanization of substantially uncoagulated rubber latex containing an organic accelerator capable of effecting vulcanization at temperatures below those ordinarily employed in hot vulcanization methods."

Although Judge Hincks who tried the case in the District Court simply held that the Gibbons Patent was not infringed, we think it unnecessary to deal with the difficult and controversial matters involved in that conclusion because we have no doubt that the patent is invalid for lack of invention.

The Italian Patents to Bruni granted in 1919 set forth a "process for the vulcanization of rubber or of objects made of natural or synthetic gum elastic (rubber), or of any nature whatsoever". The pertinency of the reference is criticized because Bruni specifies only rubber and not latex in his patents and mentions only one class of accelerators, the dithiocarbomates, referred to by Gibbons. But latex is defined in the Hopkinson Patent in suit as "the natural salt water emulsion of rubber obtained from the rubber trees" and is described as "rubber in the form of latex" in all four examples of the Gibbons process given by him in his specification. Bruni's Patents employ one of the classes of accelerators described by Gibbons and it is stated in the Bruni Patent No. 173,364 that one of the advantages of the Bruni process is "vulcanization at temperatures which are much lower than those customarily employed for the vulcanization in the hot, for instance, at temperatures below 100°." The temperature mentioned is according to the Centigrade scale and equals 212° Fahrenheit referred to as a desirable low temperature in Examples 1 and 4 of the Gibbons Patent. Bruni says nothing about drying, but about vulcanizing at a suitable temperature which would produce drying. Thus he does not disclose the two separate steps of first drying and then vulcanizing which complainant argues with much difficulty are the features of the Gibbons process and which the court below found were not separate but concurrent.

Judge Brewster truly said in Vultex Corporation v. Heveatex Corporation, D. C., 19 F.Supp. 327, 330: "It would seem to be obvious to any chemist, endowed with a reasonable knowledge of the art of vulcanizing rubber, that the cold vulcanizing process, well-known in its application to dry rubber, could likewise be applied in a process of vulcanizing the latex. This, in my opinion, would not amount to a patentable discovery."

We can see no room for Gibbons' process as a new invention after Bruni.

If, however, complainant is right and there is a distinction between Bruni and Gibbons due to its construction of the latter's claim that drying must precede and not be concurrent with vulcanization, this process was disclosed in U. S. Patent No. 1,605,649 to Curtis. That patent clearly anticipates Gibbons unless the latter carried back his invention to an earlier date than Curtis. Curtis describes a process of drying and then vulcanizing. He says: "As an example a piece of haircloth may be immersed in rubber latex of 25% rubber solids and containing curing ingredients embodying low temperature curing accelerators. After drying the cloth may be allowed to cure at ordinary temperatures, or the cure may be hastened by heat, but the temperature should not be raised to such a point as to injure the hair, and it has been found that temperatures from 150° to 200° F. are suitable. One means of carrying out the above is to employ latex which contains 1 part of zinc dimethyldithiocarbamate, 1 part of zinc oxide and 3 parts of sulphur on 100 parts of rubber. Haircloth impregnated with this mixture and dried will vulcanize satisfactorily overnight at 150° F. or in 2 hours at 200° F."

The failure of Curtis to claim Gibbons' invention can make no difference if he disclosed the invention in his application as he did. Milburn Co. v. Davis, etc., Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651. We are satisfied that Gibbons date of invention was not carried back of his filing date which was six months later than that of the Curtis application. This is in accordance with the express finding of the court below. Gibbons testified that the best description of his process in his note book is on page 45. It indicates that September 9, 1919, he impregnated cotton fiber with latex, that the fabric was dried overnight and then vacuum dried one-half hour at 40 pounds steam pressure, i. e., at 287°. This temperature was far above 240° which was shown by complainant's expert to be the low limit of hot vulcanization. In another test the same day Gibbons vulcanized at a temperature of 286° F. On September 19 the notebook refers to a temperature of 230° F., and on November 11 of 220°. On the earlier date the entry states that the mix "did not cure well" and, on November 20, that paper dipped in latex and cured in hot air "did not appear very interesting". Moreover, on September 16, the notebook reads: "On account of the property of curing at low temps possessed by above it was decided to use a different latex mix which would not vulcanize at say 212—thus enabling us to dry at 212°". It is evident from the foregoing that Gibbons regarded curing at low temperatures as unsuccessful and that he never produced a useful article cured at such temperatures—in other words, that his ex-

periments along that line were failures and for an indefinite period were abandoned. Indeed, his main effort seems to have been satisfactorily to impregnate the fibers of his textiles with latex rather than to vulcanize at low temperatures. There is no satisfactory proof that he ever reduced his invention to practice before the date of the application for his patent. Moreover, the fact that for more than four years after September, 1919, when he claims to have made his invention, he filed no application to obtain a patent for his process convinces us that he did not make the invention in 1919 and is entitled to no date earlier than that of his application. It is quite impossible to carry back an invention by any such inconclusive proof as Gibbons has furnished when the burden of antedating an application is so heavy. We hold that in view of the Curtis Patent the Gibbons Patent is void for lack of invention.

Hopkinson Patent No. 1,784,523.

Various claims of the Hopkinson Patent are in issue, but Claim 2 is sufficiently illustrative, which reads as follows: "The method of making rubberized articles of fibrous material which comprises superficially coating normally penetrable fibrous material with a thickened and compounded water emulsion of rubber without substantial penetration of the material, and drying, thereby attaining a minimum loss of flexibility."

The patentee calls attention to the fact that in certain articles of manufacture such as rubber tires great strength is obtained by impregnation and the loss of flexibility is not objectionable. But he goes on to say that in other articles such as water-proofed clothing, rubberized fabric, gloves, bathing shoes and light overshoes impregnation and loss of flexibility are highly objectionable. He says that by using a thickened latex for the coating it may be applied without a substantial penetration of the fibrous material and that in all cases the consistency of the compound should be such that substantial penetration will not occur. He adds that he employs approximately 50% of solid content in his mixture, gives several formulae for compounding it and sets out the coating and vulcanizing process. Finally he says that his process secures a strong bond between the coating and material without substantial penetration of the fabric.

Hopkinson's thought was to employ a latex compound sufficiently thick to avoid much penetration and sufficiently thin to secure a strong bond. Morisse in "Le-Latex" published in 1908 showed that a thick latex would not penetrate fabric sufficiently for his purpose, which was for making automobile tires that would not blow out as a result of the loosening of the rubber from the fabric. He says: "At first I thought that it was necessary to use a thickened latex, namely one which had been thickened by special centrifugation. The rubber 'cream' thus obtained was spread on the fabric like a sort of shoe polish and the fabric was set aside so that evaporation could take place. This process is not at all practical. As a matter of fact, the rubber does not sufficiently penetrate the fabric; it separates easily and it therefore does not adhere well."

As we have already noted, Hopkinson himself stated in his specification that penetration of the latex compound is necessary for making strong tires. Morisse fully understood and in his publication disclosed the fact that latex will penetrate fabrics but that concentrated latex will not do this to any substantial extent. In the French Patent of 1909 No. 398,705 reference is made to mixtures of latex prepared under patents of Morisse having a proportion of 40% gelatine and 60% hevea latex. It teaches that this mixture when vulcanized will make an "elastic sheet". It is true that nothing is said about how to apply the compound or to avoid penetration, but the instruction as to how to make a thickened mixture and the result claimed to follow would seem to indicate that the French patentee was doing much the same thing that Hopkinson's Patent discloses. Manufacture under the British Patent to Hancock and Silver A. D. 1864 No. 3110 is said to produce "flexible elastic waterproof articles.". That patent discloses a process similar to Hopkinson's for making a latex compound for the manufacture of "flexible elastic waterproof articles." U. S. Patent No. 1,523,821 to McGavack also describes concentrating latex to a percentage of 65% solids. The compound was for coating fabrics and might be applied in the way described by Hopkinson.

It seems evident that the desirability of having the latex compound penetrate the fabric deeply or not substantially depends on the nature of the fabric or the use to

which the product is to be put. In view of the general state of the art it is reasonable to suppose that the idea of Hopkinson has for years been in the minds of men manufacturing rubber coatings. Certainly Morisse understood it when he found a thick solution of rubber inapplicable to tires where a maximum of penetration was necessary to prevent them from blowing out. He must have known that a considerable concentration would furnish a superficial coating that would afford flexibility and that it could be made thin enough to make a good bond. The difficulty is in compounding the right mixture for a given fabric. It is a purely practical and not a theoretical difficulty which must be solved by the ordinary skill of the artisan exercised through trial and error. In other words, to avoid bulk and stiffness, and to obtain a light flexible article, he will concentrate such a compound for coating as will afford a satisfactory bond. We agree with the court below that the Hopkinson Patent is invalid for lack of invention.

Foster and Cook Patent No. 1,816,574.

This patent follows Hopkinson and adds nothing to his process beyond applying it to a fabric in which strands instead of being woven into the base are loosely needled in. While it is true that the purpose of the Hopkinson process was to waterproof the fabric and that of Foster and Cook to anchor the piles to the base, the latter process was merely a new use of Hopkinson's process and the application of it to anchoring piles required no inventive thought. Moreover, U. S. Patent No. 2,-007,078 to Crabtree discloses a process for anchoring "the pile into the ground or back of the cloth by means of a cementitious or viscous coating, for example, a cellulous compound such as pyroxylin". The fact that Crabtree suggested "pyroxylin" is unimportant, even if another compound would have been better, for later he said that the coating might also be a "rubber composition" which would include the prior compound of Gibbons or Hopkinson. Nor is it important that in his original application he spoke of stiffening his material so that it would be unnecessary to use cardboard for automobile linings since he spoke elsewhere in that application of applying "a thin layer of the coating". But even if Crabtree only intended to anchor the piles by a stiff layer of rubber instead of one that was flexible it certainly

was no invention to use the compound and method of anchorage of Hopkinson in place of the stiffer anchorage of Crabtree for coating the pile fabric of the Crabtree Patent.

The decree is affirmed.