**LUDLOW MANUFACTURING & SALES CO.**
**v. DOLPHIN JUTE MILLS, Inc.**

No. 1096.

District Court, D. New Jersey.

June 14, 1943.

Bernard M. Shanley, III, of Newark, N. J. (Pennie, Davis, Marvin & Edmonds, Leslie B. Young, and George E. Middleton, all of New York City, of counsel), for plaintiffs.

John W. Steward, of Paterson, N. J. (William S. Pritchard and Harry H. Levin, both of New York City, of counsel), for defendant.

SMITH, District Judge.

This is a suit under the patent laws for the infringement of claims 1 and 6 of Patent No. 1,893,809, issued on the application of Malcolm B. Stone and William P. Williamson, who, prior to the issuance thereof, assigned all right, title and interest therein to the plaintiffs. The invention, in the language of the patent, "relates to the manufacture of yarn from long fibers, such, for example, as bast fibers including jute, hemp and flax, and is concerned more particularly with a *novel method for drawing and spinning fibers* and *apparatus by which this method may be advantageously practiced.*" (Emphasis by the Court). The claims in issue, however, cover only the "method of making yarn from bast and similar long fibers." This suit is directed to a method admittedly practiced

in the mills of the defendant, the essential features of which are inherent in a "sliver drawing mechanism" designed and constructed for its practice, and covered by a patent to Malcolm Hain, No. 2,197,638. The defendant denies infringement and challenges the validity of the claims.

It is difficult to comprehend the nature of the purported invention without some knowledge of the art to which it pertains. The manufacture of yarn from bast fibers, such as jute, hemp, and flax, is a multiple process consisting of three successive operations which are common to both the methods of the prior art, which are hereinafter discussed, and the method of the claims in suit. These operations are identified in the industry as carding, drawing, and spinning. The nomenclature is descriptive of both the operations and the apparatus by which they are performed. The claims of the patent, and particularly the claims in suit, are expressly limited to the final operations, drawing and spinning.

There were, prior to the introduction of the method of the claims in suit, but two recognized methods of drawing and spinning bast fibers. The one, commonly known as rove spinning, consists of three successive operations: First, drawing, in which the raw material, which has been previously combed and reduced to sliver[1] in the carding operation, is subjected to draft, the fibers of the sliver thereby attenuated, the slivers of two independent but synchronous operations doubled, and the doubled sliver compressed and delivered to containers; second, roving, in which the sliver is again subjected to draft, the fibers thereof further attenuated, the attenuated fibers loosely twisted and reduced to rove,[2] and the rove wound on bobbins; and third, spinning, in which the fibers of the rove are finally twisted and reduced to yarn. The other, commonly known as gill spinning, although essentially similar to rove spinning, consists of but two successive operations: First, drawing, in which the raw material, which has been previously combed and reduced to sliver in the carding operation, is treated in the manner described; and second, spinning, in which the sliver is again subjected to draft, the fibers thereof further attenuated and the attenuated fibers twisted and reduced to yarn without having been first

reduced to rove. The drawing operations of the respective methods are identical and may be carried out in the same apparatus. The former method differs from the latter only in the final operation, spinning. It should be noted that the method of the purported invention has not supplanted the methods of the prior art; it is conceded that the methods of the prior art are still in common use.

It is obvious that the described operations of the respective methods, as practiced commercially, are the characteristic functions of the elements of the apparatus by which these operations are performed. The apparatus utilized in the operations, although structurally complex, are identical in their basic construction. The drawing frame consists of three elements: A drawing mechanism, which comprises a set of retaining rolls and a set of drawing rolls so arranged, constructed, and operated, as to attenuate the fibers which pass through and between them; a gill bed between the said sets of rolls, which comprises a series of mechanically operated gill bars so arranged, constructed, and operated, as to support and comb the fibers while conveying them from the retaining rolls to the drawing rolls; and, a doubling plate between the drawing rolls and the delivery rolls, which, as the name implies, comprises a fixed surface so constructed as to double the slivers, the products of two independent but synchronous operations. The roving frame is identical in construction except for the doubling plate; there is substituted for this element a flyer which imparts a loose twist to the fibers of the sliver, reducing it to rove. The gill spinning frame is identical in construction with the roving frame, but in the spinning operation the flyer is operated in such a manner and at such a speed as to impart to the fibers a hard twist. The rove spinning frame is identical in construction with the gill spinning frame except for the gill bed; there is substituted for this element a breastplate which is so arranged and constructed as to support and control the fibers of the rove. The drawing mechanism is an essential element of each of the described frames, and in this device the retaining rolls and the drawing rolls are so spaced that the reach exceeds the length of the longest fiber.

---

[1] Sliver, the product of the carding operation, is a long, slender strand of fibers.

[2] Rove, the product of the roving operation, is a strand of fibers to which a slight twist has been imparted.

It will hereinafter be seen that the apparatus claims, 9 to 13, inclusive, are directed to a drawing frame, the novel element of which, a "slip control device," is recommended as an improvement over the gill bed. The inventive concept, if any, inherent in the claims in issue, is predicated primarily upon the function of this device. It is necessary, therefore, since comparisons must be made, that we understand the most important function of the gill bed. The gill bed, in addition to combing and supporting the fibers while conveying them from the retaining rolls to the drawing rolls, retards and controls the vagrant (short) fibers in the reach of the frame. The performance of this function, in both the drawing frame and the spinning frame, prevents "gulping," a condition caused by vagrant fibers, which, if not prevented, impairs the uniformity and quality of the finished yarn. This condition is not peculiar to the manufacture of yarn from bast fibers, but is common to the manufacture of yarns from all vegetable fibers.

There are intrinsic in each of the methods of the prior art, both of which are generally regarded as efficient, advantages and disadvantages not found in the other. It seems unnecessary, however, to consider any except those which are pertinent; these affect particularly the economy of operation, the desideratum in the jute industry. Rove spinning permits the final attenuation and spinning of the fibers under high draft and at high speed, which contributes to the efficiency of the operation, but it prohibits the handling of the fibers except in small packages, the rove, which impairs the uniformity and quality of the yarn and increases the labor costs. Gill spinning permits the handling of the fibers in large packages, the sliver, which contributes to the efficiency of the operation and improves the uniformity and quality of the yarn, but it prohibits the final attenuation and spinning of the fibers under high draft and high speed, which reduces the rate of production. The principal disadvantage of gill spinning is ascribable to the gill bed.

It is obvious that when Stone and Williamson entered the field they sought not a *new method* of drawing and spinning bast fibers but a *device or mechanism* which would successfully perform all of the functions of the gill bed. Their search led to the prior art and particularly to the patents cited by the defendant, which are hereinafter discussed. These findings are amply supported by the testimony of Malcolm B. Stone, who frankly admitted the resort to the prior art and the experimentation with numerous devices there disclosed. The resultant advance over the prior art, although a tribute to their mechanical ingenuity, will not support their claim to invention.

The claims to apparatus, although not in issue here, must be considered because they clearly embrace, as the characteristic and peculiar functions of the elements of the apparatus therein defined, the successive steps of the purported method of the claims in issue. The apparatus conceived by Stone and Williamson, to which claims 9 to 13, inclusive, are directed, is defined in claim 10, which is comprehensive and typical, as follows: "In *a frame for drawing fibrous products,* the combination of a pair of retaining rolls for a single fibrous strand, a pair of drawing rolls for said strand, and a *slip control device* for said strand between said pairs of rolls, *said device comprising a pair of rolls between which said strand passes, the upper roll of said pair being mounted to move freely toward and away from the lower roll in accordance with inequalities in said strand,* and both rolls being fluted and having their ribs meshing during operation, the upper roll having its ribs partially cut away between its ends and said lower roll being in fixed bearings and positively driven, *said device permitting fibres gripped by said drawing rolls to slip through it, while holding back other fibres."* (Emphasis by the Court). The only element of the combination which may be regarded as novel is the "slip control device"; the other elements of the combination are concededly old. The "slip control device" in the combination is a substitute for the gill bed and performs a similar function; it supports the long fibers and retards and controls the vagrant fibers, and thereby prevents "gulping." It should be noted that the apparatus defined in the quoted claim, like the gill frame of the prior art, may be used in either the drawing or spinning operation, or both.

It is apparent that the successive operations embodied in the method of the claims in issue, 1 and 6, are the characteristic and peculiar functions of the elements of the apparatus depicted in the specifications of the patent and recommended therein as the means by which the method may be practiced. These operations are defined in

claim 1, which is typical, as follows: "A method of making yarn from bast and similar long fibres which comprises *subjecting sliver to a drawing operation,*" (the operative function of the drawing mechanism of a drawing frame) *"treating the drawn sliver of said drawing operation without twisting it* to increase its ability to undergo a lengthwise pull without being broken," (the operative function of any of the usual expedients, such as a bellmouthed conductor followed by a pair of pressure delivery rolls, a doubling plate followed by a pair of pressure delivery rolls, or a crimping mechanism) *"subjecting the treated sliver to a single final drawing operation* reducing it to yarn size," (the operative function of the drawing mechanism of the frame defined in the quoted claim) *"an extended length of the sliver being supported and subjected to dragging control* without the use of gills, during the said single drawing operation," (the operative function of the "slip control device" of the said frame) *"and twisting the product of said single drawing operation and winding it into a yarn package."* (Emphasis by the Court). The final operation, which is admittedly old, is common to both the methods of the prior art and the method of the claims in issue.

█ It is our firm conviction that the claims in issue do not define a patentable method but define the peculiar and characteristic functions of the elements of the apparatus recommended for its practice, and appropriately illustrated and described in the specifications of the patent. There is no suggestion in either the patent or the evidence that the method may be practiced by any other means. It seems reasonably clear from a reading of the patent in its entirety that the essence of the invention, if any, resides not in the method but in the apparatus, and particularly in the elements thereof defined in claim 10, hereinabove quoted. The successive operations of the purported method, as hereinabove stated, are inherent in the elements of the apparatus as the peculiar and characteristic functions thereof. It necessarily follows that the claims in issue are invalid. Oxford Varnish Corp. v. General Motors Corp., 6 Cir., 120 F. 2d 44; Risdon Iron & Locomotive Works v. Medart, 158 U.S. 68, 15 S.Ct. 745, 39 L.Ed. 899; Bauer Bros. Co. v. Bogalusa Paper Co., 5 Cir., 96 F.2d 991; Thordarson Electric Mfg. Co. v. General Transformer Corp., 7 Cir., 93 F.2d 36; Detroit Gasket & Mfg. Co. v. Fitzgerald Mfg. Co., 2 Cir., 89 F.2d 178; Black-Clawson Co. v. Centrifugal Engineering & Pat. Corp., 6 Cir., 83 F.2d 116; Continental Can Co. v. Cameron Can Machinery Co., 7 Cir., 76 F.2d 173; Interstate Folding Box Co. v. Empire Box Corp., 7 Cir., 68 F.2d 500; Smith Engineering Works v. Nordberg Mfg. Co., 7 Cir., 68 F.2d 492; Chisholm-Ryder Co. v. Buck, 4 Cir., 65 F.2d 735; American Lava Co. v. Steward, 6 Cir., 155 F. 731.

█ When the claims in issue are read and construed in the light of the prior art, as they must be, the absence of patentable invention seems to be clearly demonstrated. The successive operations of the purported method are inherent in devices of the prior art, several of which were admittedly in common use and others of which were disclosed by patents of the prior art. It is particularly significant here that these devices, and the elements of which they are comprised, are not only adaptable to the said operations, but the said operations are inherent in them as their normal and intended functions. It follows that the claims in issue, since they define the peculiar and characteristic functions of the apparatus recommended for the practice of the purported method, are anticipated by the devices of the prior art in which these functions are inherent. Saranac Automatic Mach. Corp. v. Wirebounds Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634; Goodman v. Paul E. Hawkinson Co., 9 Cir., 120 F.2d 167; Gamble-Skogmo, Inc., v. Paul E. Hawkinson Co., 8 Cir., 98 F.2d 37; Claude Neon Lights, Inc. v. E. Machlett & Son, 2 Cir., 27 F.2d 702; In re Watson, 44 F.2d 868, 18 C.C.P.A., Patents, 712. However, claims which are so drafted as to embrace the functions of earlier apparatus are void, not because they are anticipated, but because they are functional. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 423, 424, 425, 22 S.Ct. 698, 46 L.Ed. 968.

The purported method consists of three successive steps, the last of which embodies the inventive concept, if any, of the present invention. The initial steps were, and had been for many years prior to the introduction of the purported method, in common use. This is equally true of the apparatus by which they were practiced. The first step, as defined in the quoted claim, consists of "subjecting sliver to a drawing operation." This step, the

normal function of the drawing mechanism of a drawing frame, may be carried out, according to the patent, in the ordinary drawing frame with or without the use of gills. The second step, as defined in the quoted claim, consists of "treating the drawn sliver of said drawing operation without twisting it to increase its ability to undergo a lengthwise pull without being broken." This step, the normal function of any of the usual expedients hereinabove identified, may be carried out, according to the patent, by means of any of these expedients; however, the use of a crimping mechanism is particularly recommended. The complete absence of novelty in either of the initial steps, independently considered, seems apparent. The novelty, if any, is in the "combination" of the three steps of the method, which is inferentially conceded by the plaintiffs.

The final step of the purported method comprises two concomitant operations. These operations, as hereinabove stated, are inherent in the elements of the apparatus defined in claims 9 to 13, inclusive, as the peculiar and characteristic functions of the said elements. The first operation, as defined in the quoted claim, consists of "subjecting the treated sliver to a *single final drawing operation* reducing it to yarn size." This operation, the normal function of the drawing mechanism of a drawing frame, is carried out, according to the patent, in either the drawing frame defined in claims 9 to 13, inclusive, or a drawing frame of similar construction. The second operation, as defined in claim 6, consists of "subjecting the sliver being acted on to slipping control throughout a substantial portion of its length undergoing draft without the use of gills." (The expression of claim 6 is here adopted because it more clearly defines the operation). The stated objects of this operation are the retardation and control of the vagrant fibers and the consequent prevention of "gulping." This operation, however, upon which the claim of novelty primarily rests, is inherent, not only in the "slip control device" defined in claims 9 to 13, inclusive, but in similar devices disclosed in the patents of the prior art.

The patent to Meier, No. 1,583,893, is directed to a "drawing mechanism" comprising a set of retaining rolls, a set of drawing rolls, and an intermediate slip control device consisting of "a pair of intermediate pressure rollers, and a further intermediate pressure roller cooperating with the lower roller of said pair of intermediate pressure rollers." The patent to Thoma, No. 1,579,414, is directed to a drawing mechanism comprising a set of retaining rolls, a set of drawing rolls, and an intermediate slip control device therein defined as a "guide means including two intermediate pressure rollers and an adjustable bridge member." The invention, in the words of the patent, "relates to drawing mechanism for drawing any kind of fibrous materials in the form of slivers or rovings." The twenty-five claims of this patent define as many modifications of the slip control device, and it is, therefore, difficult to select any one of them as particularly relevant without detracting from the full significance of the disclosures of the patent. The patent to Vanni, No. 1,545,803, is directed particularly to a slip control device, which is defined in claim 1 thereof as follows: "* * *, a drawing mechanism comprising a retaining cylinder, a pair of rollers, each of which is free to rise, located immediately above and adjacent to the cylinder, and a belt passing around said rollers and adapted to slowly advance the mass of fibers and to press them lightly against said cylinder *to be braked and compacted thereby,* * * *." (Emphasis by the Court). The patent to Von Trumbach, No. 1,786,180, is likewise directed to a slip control device which is defined in claim 1 thereof as follows: "* * *, a nipper movably mounted above a drawing cylinder including a pressure jaw for bearing on the yarn said pressure jaw presenting pressure surfaces, for co-operating with said drawing cylinder, comprising freely mounted rollers provided with frictional peripheral surfaces and interdriving means between said rollers, * * *." The patent to Latsch, No. 1,421,965, is directed to a spinning frame, and particularly to the slip control device embodied therein. The invention is defined in claim 2 of the said patent as follows: "High slip-draft apparatus for spinning cotton rovings comprising in combination three pairs of drawn rolls of which the front and middle pair are on centers spaced a distance equal to substantially the average length of the fiber and *the middle rolls being smooth and of smaller diameter than the front rolls and the weight of the top middle roll adjusted to permit of slippage of the roving, and means for driving both of the middle rolls to prevent stoppage due to impurities in the roving."* (Emphasis by the Court).

The patent to Campbell, No. 1,370,407, and the patent to Butler, No. 1,448,191, are likewise directed to spinning frames, and particularly to the slip control devices embodied therein.

There are but three of the foreign patents cited which are relevant; the disclosures of the others are too remote. The patent to Greg, Br. 127,702, is directed to a slip control device comprising "a pair of comparatively small diameter pressure rollers." It is therein suggested that the device is adaptable to either the drawing frame or the spinning frame. The patent to Sacasas, Br. 240,028, is directed to an improvement in drawing and spinning frames, and particularly to a slip control device therein defined as "a penultimate drawing roller which cooperates with a pair of pressure rollers wherein said pressure rollers are geared to the drawing roller and subject to pressure by a system consisting of levers and counterweights." The patent to Giacomo, It. 247,134, is directed to a slip control device comprising a set of rolls between the retaining rolls and the drawing rolls. It is asserted that this device is, likewise, adaptable to either the drawing frame or the spinning frame.

The necessary limits of this opinion will not permit an exhaustive discussion of the devices disclosed by the cited references. It is sufficient for present purposes to note that the devices are similar in their basic structural elements and differ only in their form of construction and distinctiveness of arrangement. The appositeness of the references, however, lies not only in their disclosures of slip control devices but in their disclosure of the intrinsic functions and operative principles common to such devices. This conclusion is not predicated upon mere conjecture but upon the unmistakable language of the patentees, who assert that the functions of their respective slip control devices are to retard and control the vagrant fibers and to thereby prevent "gulping." The contention, here urged by the plaintiffs, that the disclosures of the cited references are insufficient to sustain the averment of anticipation, is untenable. The plaintiffs can, as they do in their argument, point out distinctions in descriptive language, but they cannot avoid the full import of the substance of the disclosures.

The patents to Abbot, Nos. 317,608 and 317,607, are particularly pertinent and must be jointly considered. The former is directed to an "Improved Process of Spinning Cotton Yarn," which is defined in claim 1 thereof as follows: "The described process of making cotton yarn, *consisting in bringing the cotton fiber to the condition of sliver* and *drawing and doubling the sliver* for the purpose of evening it, *then further drawing and compacting or condensing without twisting the sliver thus prepared until it is reduced to the attenuated form requisite to allow it to be spun directly into yarn,* and finally spinning said attenuated sliver directly into finished yarn, as contradistinguished from roving, * * *." (Emphasis by the Court). The latter is directed to an apparatus by which the method may be practiced, which is defined in claim 1 thereof, as follows: "The combination of *successive pairs of drawing rollers arranged and operating to receive sliver,* and *to reduce the same, without twisting, to the attenuated form requisite to allow it to be spun directly into yarn,* as contradistinguished from roving, *trumpets to compact or condense said sliver during this process of reduction,* and ring-spindles, and travelers or their equivalent, to which said sliver is directly conducted, and by which it is directly converted into yarn, * * *." (Emphasis by the Court). Any doubt as to the relevancy of the disclosures is removed upon a reading of the cited patents in their entirety. The successive operations of the Abbot method are not distinguishable, except in descriptive language, from the initial steps of the method of the claims in issue. The patent to Russell, No. 317,675, which must be read with the patents to Abbot, discloses the adaptation of a trumpet (bellmouthed conductor) in the final drawing operation as a means of condensing, retarding, and controlling the vagrant fibers to prevent "gulping." This function, as hereinabove stated, is inherent in both the slip control devices of the prior art and the slip control device defined in the patent in suit in claims 9 to 13, inclusive, thereof.

The best evidence on this identity of function is found in the specifications of the patent, pp. 3 and 4, *ll*, 123 to 10, wherein it is stated, "These devices" (referring to the slip control device) "subject the sliver to what is known as a 'slip draft,' that is, they exercise a dragging control on that part of the sliver which is undergoing draft, allowing the fibres to slip when caught by the nip of the drawing rolls and holding back fibres which

have not yet reached the nip. * * *. The new control mechanism offers these advantages regardless of whether it is sliver or rove that is being spun but we prefer to spin sliver for the numerous reasons above pointed out." This recital is supported by the testimony of the plaintiffs' experts, who concede that the slip control devices of the prior art perform the same function.

■ It follows that the claims in issue, as method claims, are void because of anticipation by, and lack of invention over, the prior art; they disclose, as the steps of the purported method, nothing more than the succession of operations essential in devices of the prior art designed for their performance. Saranac Automatic Machine Corp. v. Wirebounds Patents Co., Goodman v. Paul E. Hawkinson Co., Gamble-Skogmo, Inc. v. Paul E. Hawkinson Co., Claude Neon Lights, Inc. v. E. Machlett & Son, and In re Watson, all supra. The drawing frame conceived by Stone and Williamson and defined by them in claims 9 to 13, inclusive, may be a patentable improvement on the earlier apparatus, and particularly the slip control devices, but this is not the invention of the claims in issue. The essence of the present invention, as hereinabove stated, resides in the apparatus, to which the success of the purported method is obviously ascribable, and not in the method defined in the claims in issue. However, the judgment of the court on the validity of the apparatus claims is not here invoked; these claims have been withdrawn from suit.

■■ The claim to invention over the prior art seems to rest primarily upon the contention that "nowhere in the art prior to the patent in suit was there any disclosure of a method of *spinning jute yarn* directly from sliver without the use of gills." (Emphasis by the Court). This contention neither enhances the claim to invention nor impairs the disclosures of the prior art. The successive operations embodied in the purported method were clearly old, and their adaptation to the *spinning of jute yarn* required nothing more than the expected skill of the art. It is well established that the application of an old method to a new and closely analogous subject matter, plainly indicated by the prior art as an appropriate subject of the method, is not invention. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997;

Lovell Mfg. Co. v. Cary, 147 U.S. 623, 13 S.Ct. 472, 37 L.Ed. 307; Howe Mach. Co. v. National Needle Co., 134 U.S. 388, 10 S.Ct. 570, 33 L.Ed. 963; Floridin Co. v. Attapulgus Clay Co., 3 Cir., 125 F.2d 669; Dorr Co., Inc., v. Yabucoa Sugar Co., 1 Cir., 119 F.2d 521; Globe Oil & Refining Co. v. Sinclair Refining Co., 3 Cir., 103 F.2d 95; United States Rubber Co. v. Sidney Blumenthal & Co., 2 Cir., 98 F.2d 767; Celite Corp. v. Dicalite Co., 9 Cir., 96 F.2d 242; Waddell v. Eastman Kodak Co., 2 Cir., 91 F.2d 980. The fact that those who preceded Stone and Williamson perceived neither all of the advantages of their inventions nor all of the uses to which they were readily adaptable does not detract from the comprehensive significance of their disclosures. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610; Lovell Mfg. Co. v. Cary, supra; Nichols v. Minnesota Min. & Mfg. Co., 4 Cir., 109 F.2d 162; Floridin Co. v. Attapulgus Clay Co., Goodman v. Paul E. Hawkinson Co., both supra. See Radio Corporation of America v. Radio Engineering Laboratories, 293 U.S. 1, 14, 55 S.Ct. 928, 79 L.Ed. 163.

The resort to the prior art, a course admittedly followed by Stone and Williamson, was plainly indicated by the problem which confronted them, the spinning of jute fibers from sliver without the use of gills. The prior art disclosed, not only the successive operations embraced in the purported method, but the basic structural elements of the apparatus essential to their performance, to wit, the drawing mechanism, the crimping mechanism, and the slip control device. Stone and Williamson, having perceived the adaptability of the said operations to the spinning of bast fibers, conceived an appropriate apparatus for their performance. The apparatus comprises as the essential features thereof a drawing mechanism, a crimping mechanism, and a slip control device. The apparatus, as defined in the patent, may be novel, but there is nothing novel in the operative functions inherent in its elements, defined in the claims in issue as the successive steps of the purported method. The effect of this conclusion, supported, as it is, by both the admission of the plaintiffs and the testimony of their experts, is not overcome by the contention that the application of the method to the spinning of *bast fibers* was new. It may be conceded that the adaptation of old expedi-

ents to a new use in a remote field may rise to the dignity of invention if an original and useful result, not theretofore conceived, is accomplished. The invention of the claims in issue, however, does not meet the requirements of the rule. The purported method was, and had been for many years, in common use in the spinning of cotton yarn, and its adaptation to the spinning of jute yarn required nothing more than mechanical ingenuity. The mere production of an improved yarn, which is not disputed, is not a new and useful result within the meaning of the rule.

 The apparatus recommended by Stone and Williamson as the means by which the purported method may be "advantageously practiced" comprises a mere aggregation of well known elements, each of which performs its peculiar and characteristic function in the usual manner without producing any new or useful result. The claims in issue disclose, as the successive steps of the purported method, a mere aggregation of the operative functions inherent in the said elements. The aggregation of old expedients, either in an apparatus or a method, is not invention. Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Dorr Co. v. Yabucoa Sugar Co., supra; Grosjean v. Panther-Panco Rubber Co., 1 Cir., 113 F.2d 252; Smith Engineering Works v. Nordberg Mfg. Co., 7 Cir., 68 F.2d 492; Interstate Folding Box Co. v. Empire Box Corp., 7 Cir., 68 F.2d 500. The language of the court in the last case seems to be particularly applicable here. It was therein stated, 68 F.2d at page 501: "The steps of the process claim * * * were limited to the successive 'mechanical transactions' of the machine which was itself covered by the patent issued on the same day as the process patent and upon identical specifications. No step of any of the process claims was new nor was there novelty in the order or the number of said steps nor in the product that resulted therefrom. The steps were individually and collectively the acts—that is, the operations—of the machine, and as described, were limited to the machine covered by the patent. Under such circumstances there is no valid basis for support of the process patent." The apparatus conceived by Stone and Williamson and defined by them in the patent may be a patentable improvement on the earlier apparatus but the method of the

claims in issue is not a patentable improvement on the earlier methods. These claims define a mere aggregation of well known expedients and are, therefore, void for want of invention. Standard Brands v. National Grain Yeast Corp., 101 F.2d 814, affirmed 308 U.S. 34, 60 S.Ct. 27, 84 L. Ed. 17.

 The claims in issue are invalid because of their failure to meet the requirements of R.S. § 4888, 35 U.S.C.A. § 33. The statute requires the inventor to define his invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, * * * to make, construct, compound, and use the same", and, to "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." The claims are invalid particularly because of their failure to satisfy the latter requirement. General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; B. B. Chemical Co. v. Cataract Chemical Co., 2 Cir., 122 F.2d 526. The reasons underlying these statutory requirements are succinctly stated in the case of General Electric Co. v. Wabash Appliance Corp., 304 U.S. at page 369, 58 S.Ct. at page 902, 82 L.Ed. 1402, as follows: "The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.'" These reasons are apposite in the instant case.

When construed in the light of the specifications, the claims in issue are sufficiently instructive to enable persons skilled in the art to practice the purported method, but, even when so construed, they do not define "the limits of the monopoly asserted" with the required certainty. The claims are so drafted as to embrace any method of drawing and spinning bast fibers in which the drawn sliver is first treated *"without twisting it* to increase

its ability to undergo a lengthwise pull without being broken," and, second, "subjected to dragging control" in the final operation *"without the use of gills."* (Emphasis by the Court). The critical limits of the patent are not defined except in negative language. The claims, as the measure of the alleged invention, not only preclude the utilization of earlier devices in common use, but impede further progress in the art, contrary to both the letter and the spirit of the patent laws.

The accused method, admittedly practiced in the mills of the defendant, consists of two successive operations: First, drawing, in which the raw material, which has been previously combed and reduced to sliver in the carding operation, is subjected to draft, the fibers of the sliver thereby attenuated, the slivers of two independent but synchronous operations doubled, and the doubled sliver compressed and delivered to containers; and second, spinning, in which the sliver is again subjected to draft, the fibers of the sliver thereby further attenuated, *the sliver subjected to "slip control,"* and the attenuated fibers twisted and reduced to yarn without having been first reduced to rove. The successive operations of this method, except for the subjection of the sliver to "slip control," are identical with the successive operations of the gill spinning method of the prior art. The first operation is carried out in a drawing frame which is identical in its structural elements with the drawing frame hereinabove described, which has been in common use for many years. The second operation is carried out in the spinning frame defined in the patent to Malcolm Hain, No. 2,-197,638, which comprises a set of retaining rolls, a set of drawing rolls, and a slip control device between the said sets of rolls. The slip control device in the said apparatus, as in the apparatus of Stone and Williamson, replaces the gill bed in the gill spinning frame and performs a similar function; it supports the long fibers and retards and controls the vagrant fibers, and thereby prevents "gulping." Slip control devices of similar construction are, and have been for many years, in common use in the cotton art, and in this art they perform a like function.

The plaintiffs charge that the doubling and compressing of the sliver in the first operation, drawing, in the manner hereinabove described, is an infringement of that step of the method of the invention which requires "treating the drawn sliver * * * without twisting it to increase its ability to undergo a lengthwise pull without being broken." The defendant in this step of the accused method uses only the well known devices of the prior art, a doubling plate followed by a bellmouthed conductor and a pair of pressure delivery rolls, in the usual manner in which they perform their normal function. There is in the accused method no treatment of the drawn sliver "to increase its ability to undergo a lengthwise pull without being broken," except that which had been in common use in the jute industry prior to Stone and Williamson. The operations of which the plaintiffs complain, the doubling and compressing of the sliver, are inherent in the said devices as the peculiar and characteristic functions thereof, and the consequent ability of the drawn sliver "to undergo a lengthwise pull without being broken" is the unavoidable result. The absence of infringement seems obvious.

The plaintiffs further charge that the second operation, spinning, as carried out by the defendant, is an infringement of that step of the method of the invention which requires "subjecting the treated sliver to a *single final drawing operation* reducing it to yarn size, an extended length of the sliver being supported and *subjected to dragging control without the use of gills,* during said single drawing operation." (Emphasis by the Court). In this operation of the accused method, as hereinabove stated, the sliver is subjected to draft, the fibers of the sliver thereby attenuated, *the sliver subjected to "slip control,"* and the attenuated fibers twisted and reduced to yarn without having been first reduced to rove. The only step of this operation which distinguishes it from the gill spinning of the prior art is that in which the sliver is subjected to "slip control"; the other steps are identical and are conceded to be old. In this step the defendant, as do Stone and Williamson, uses a slip control device in which the described operation is inherent as the peculiar and characteristic function thereof. The operation, independent of the mechanism by which it is performed, is nothing more than the operation of the prior art as practiced in the cotton industry.

■ The apparatus defined in the patent in suit, claims 9 to 13, may be a patentable improvement on the apparatus of the prior art, and the apparatus utilized

404

by the defendant in the practice of the accused method may be an infringement, but the judgment of the Court on these questions is not invoked. When the respective methods are independently considered, as they must be, it seems reasonably clear that the successive operations of the accused method, as well as the successive operations of the method of the invention, follow the teachings of the prior art. There can be no infringement under these facts. Comolite Corporation v. Davidovicz, 2 Cir., 111 F.2d 121; Galion Iron Works & Mfg. Co. v. Beckwith Machinery Co., 3 Cir., 105 F.2d 941.

The findings of fact and conclusions of law required by Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, have been prepared and filed by the Court.